## APPEAL OF CITIZENS TRUST CO. OF UTICA.

Docket No. 3373. Submitted July 10, 1925. Decided November 6, 1925.

1. The taxpayer held notes and other obligations of an individual who became bankrupt in 1919 and who just prior thereto delivered certain insurance policies as additional security. The bankrupt's estate was finally settled and closed in 1920. *Held*, that the taxpayer sustained a deductible loss in 1920 of the difference between its claim and the sum of the amounts of the dividend in bankruptcy and the cash-surrender value of the insurance policies at the time they were surrendered.

2. Among the furniture, fixtures, and equipment belonging to the taxpayer, were typewriters, adding and bookkeeping machines, which had a life of less than 10 years, and in the same account were desks and other equipment having a life in excess of 10 years. The Commissioner allowed a flat rate of exhaustion of 10 per cent on the entire account. *Held*, that the Commissioner's allowance was reasonable.

3. During the taxable year 1920 the taxpayer made contributions to the Oneida County Farm Bureau. *Held*, that said contributions were deductible.

4. Prior to 1920 the taxpayer made loans to an individual upon notes secured by a surety bond. The surety company became bankrupt prior to 1920. The borrower became bankrupt in 1920. In 1922 the trustee of the bankrupt borrower made final distribution. In 1923 the surety company made final distribution. *Held*, that the taxpayer sustained a loss in 1923 of the difference between the amount of its claim and the total of distributions in 1922 and 1923.

5. The taxpayer in 1918 was the owner of notes of an individual who became bankrupt in that year and whose entire assets were sold by an assignee in bankruptcy at that time. The taxpayer received final liquidation in 1920. The taxpayer purchased the assets of the bankrupt through an agent and caused them to be liquidated at a profit, this agent making deposits in the bank of the proceeds of liquidation, which was completed in 1920. In 1922 the bank paid the agent's compensation and transferred the balance of the gain to profit and loss. *Held*, that the taxpayer sustained a loss in 1920 of the difference between its claim and the amount received in liquidation of the bankrupt's estate; that it made a profit in 1920 of the net gain from the liquidation of the assets of the bankrupt purchased by it, and that in 1922 it was entitled

to deduct compensation then determined as due and paid to its agent.

6. The taxpayer from time to time made sales of securities to an individual broker or to a corporation engaged in marketing securities, of which that individual was the principal officer, without any obligation of the individual or the corporation to account to taxpayer for profits thereafter made upon the securities sold. From time to time as the securities were sold, however, the individual or the corporation paid various sums to the taxpayer. *Held*, that the taxpayer sustained losses measured by the difference between the cost and selling price of the securities when sold and realized gains on the entire amounts paid to it from time to time in connection with the disposition of such securities by the said individual or corporation.

*C. R. Dewey, Esq.*, for the taxpayer.
*M. N. Fisher, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency in income and profits taxes for the years 1919, 1920, and 1921, in the amounts, respectively, of $11,611.41, $639.61, and $274.29, a total of $12,525.31. The alleged errors on the part of the Commissioner are numerous and are fully set forth in the opinion.

### FINDINGS OF FACT.

The taxpayer is a banking corporation organized under the laws of New York with its principal place of business in Utica.

Prior to the year 1919 the taxpayer had a customer and depositor, Sam Kappler by name, who was engaged in the operation of a cheese factory outside of Utica. In March, 1919, he was indebted to the taxpayer on notes theretofore made by him in the amount of $24,855.51, and his deposit account was overdrawn in the amount of $163.48, making a total indebtedness of $25,018.99. At that time he was in financial difficulties and soon thereafter was adjudged a bankrupt. Prior thereto he had delivered to the bank as security for the payment of his notes two life-insurance policies having a total face value of $10,000 and a cash surrender value of $2,396.35. At the time of delivery one of these policies was subject to a policy loan of $988. These policies are still in force and the bank is paying and has paid the premiums thereon as they fall due. The trustee in bankruptcy sold the property of Kappler and distributed the proceeds among the creditors. There was distributed to the taxpayer on January 10, 1920, a single and final dividend in the amount of $873.43.

Prior to October 31, 1919, the taxpayer had acquired certain securities at a cost which stood on the books on that date at $14,172.

They were at that date judged by the taxpayer to be virtually worthless and were sold to A. James Eckert, a broker and dealer in securities, for the sum of $1. This sale was made for the purpose of clearing the securities out of the bank, their cost having at that date or prior thereto been charged off to profit and loss and without any agreement, express or implied, between the bank and Eckert, for any further accounting between them. Thereafter, in the year 1920, Eckert sold the securities in question and voluntarily delivered to the bank $2,119.86, the proceeds of this sale, less a profit for himself.

At the beginning of the taxable year 1919 the taxpayer had invested in typewriting, adding, and bookkeeping machine equipment a total amount of $11,629.70, and at the close of the year a total of $12,562.31. At the close of the year 1920 the total investment in typewriting, adding, and bookkeeping machine equipment was $14,685.51. At the close of 1921 the total amount was $20,355.94. The principal item in the foregoing accounts consisted of bookkeeping machines, subject to heavy wear and tear and rapid depreciation. The average life on this class of equipment did not exceed five or six years.

The taxpayer also had in the furniture, fixtures, and equipment account other assets, including desks and like furnishings, with a life greatly in excess of 10 years. Upon the entire furniture, fixtures, and equipment account the Commissioner allowed a deduction for depreciation at the rate of 10 per cent. The taxpayer in its return claimed a deduction of 20 per cent upon the item of machine equipment, and upon an automobile included in the item of furniture, fixtures, and equipment, the cost of which in 1920 was $759.44.

During the year 1920 the taxpayer paid $2,200 to the Oneida County Farm Bureau, an organization privately financed under the direction of a school commissioner in Oneida County and affiliated with Cornell University. The bank furnished the major portion of the funds necessary for the awarding of prizes among the school children of the county for agricultural products and for necessary field work in connection with the Farm Bureau extension work, the purpose of the bank in such financing being to advertise itself. This advertising was effected by associating the name of the taxpayer with the project and by holding the meeting at which contestants were judged and prizes awarded in the bank itself. At that meeting the prize winners were entertained by the bank at dinner, and the children and their parents were shown through the bank and its functions were explained to them. Many of the prizes consisted in the opening of a deposit account in which the bank placed an initial deposit of $5.

Prior to the year 1920, one Sigmund Morris was indebted to the taxpayer upon a note, to which was attached a surety bond as collateral, in the amount of $6,250. Prior to 1920 the surety company appearing on the bond became insolvent and was in process of liquidation during 1920. In that year Morris also became insolvent. At that time Morris represented that he was a party to litigation in New Jersey, which, if successful, would enable him to pay some or all of his indebtedness to the bank. It appeared to the bank that recovery was doubtful and the amount then standing on its books on the account of Morris was charged off in April, 1920. The Insurance Department of New York, which liquidated the surety company originally, denied liability on the ground that the insolvency of the surety company preceded the insolvency of Morris. In 1923, after extensive negotiations, payment was made by the Insurance Department of $1,868.41 on account of the surety company's liability on the bond. In January, 1922, Morris's trustee in bankruptcy distributed $1,431.12 to the taxpayer. The above amounts were in each case a final liquidation.

During the year 1915 the taxpayer purchased $25,000 par value of Chicago Elevated Railway notes at a total cost of $23,762.50. On July 1, 1919, interest upon these notes was defaulted. Thereafter, during the years 1919 and 1920, the taxpayer from time to time charged off amounts on account of its investment until the total amounted, in 1920, to $23,500, and the account remained upon the books of the taxpayer in the amount of $262.50. On October 20, 1920, these bonds were sold to A. James Eckert for $12.50, without any agreement for any accounting thereafter in connection with any realization which he might make thereon. Thereafter, on October 21, 1922, Eckert sold the bonds for an amount not disclosed to the bank, but on that date he voluntarily paid to the bank the sum of $5,000.

Otto L. Sonne, in November, 1918, was proprietor of a jewelry business and was heavily indebted to the taxpayer at that time. At the instigation of the taxpayer, Sonne was adjudged a bankrupt and the stock of merchandise owned by him was purchased at a judicial sale in November, 1918, by an agent acting under its direction. In the settlement of Sonne's estate the taxpayer received in final liquidation $2,903.84 up to and including the year 1920—less than the indebtedness which he owed. The agent, Rothstein, who purchased the stock of merchandise on behalf of the taxpayer, accounted in 1922 and showed, after an allowance of $500 for his services, a net profit on the purchase and sale of the merchandise of $2,040.64. Rothstein concluded the liquidation of the merchandise during 1920, and his account stood credited on the books of the bank with $2,540.64 from that time until 1922, when it was divided between the bank

and himself as set forth above. Rothstein at no time had any equitable interest in the fund other than the right to receive reasonable compensation to be agreed upon between the taxpayer and himself.

On March 9, 1920, the taxpayer purchased from the Mohawk Valley Investment Corporation, the treasurer of which was A. James Eckert, 100 shares of the stock of the Winchester Co. of a par value of $10,000, for a price of $9,720. On October 15, 1921, the Winchester Co. passed its regular dividend, and on October 31 of that year the taxpayer charged the investment down to $4,720. On December 19, 1921, the Mohawk Valley Investment Corporation repurchased the said 100 shares of stock at a price of $4,720, the figure then standing on the books of the bank after the above-mentioned charging off of $5,000. At the time of the sale to the Mohawk Valley Investment Co. the transfer was absolute and there was no obligation, expressed or implied, upon that company to account to the bank for any profits or losses on account of any subsequent disposition of such stock. On March 20, 1923, the Mohawk Valley Investment Co. sold the said 100 shares of stock at a profit to it of $1,880 and voluntarily paid the taxpayer $1,830 on account thereof.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on consent or on 15 days' notice, in accordance with Rule 50.

### OPINION.

JAMES : The taxpayer in its petition sets forth nine several and distinct allegations of error on the part of the Commissioner in the determination of the tax for the years 1919, 1920, and 1921. For the most part these errors deal with questions of fact, although in some instances the errors alleged present mixed questions of fact and law. They will be taken up in order as set forth in the findings, except as to the three transactions involving A. James Eckert, which will be considered together.

In the matter of the indebtedness of Sam Kappler the Commissioner admitted that a loss occurred, and the issue is as to the method of computing such loss and the year to which it is to be allocated. The taxpayer claims the loss in the year 1919, and the Commissioner allocates it to the year 1920. The Commissioner allows as the amount of the loss the difference between the sum total of the indebtedness of $25,018.99 and the face value of the two insurance policies, namely, $10,000. The taxpayer claims that the amount

of the loss is the amount of the total indebtedness minus the net cash surrender value of the policies in question less the policy loan of $988. Upon the latter point we believe the taxpayer is entirely correct, and that the net loss on account of the Kappler account is the difference between $25,018.99 and $2,281.88, or $22,737.11. The realization of $2,281.88 is made up of the cash surrender value of the insurance policies, $2,369.35, minus the policy loan of $988 and plus the recovery from Kappler's estate in the amount of $853.43. It appears from the findings of fact that the final settlement of the trustee in bankruptcy of Kappler's estate occurred in 1920. The loss was, therefore, determined in that year, and upon that point the determination of the Commissioner is sustained.

The taxpayer contends for a somewhat higher rate of depreciation upon typewriting and bookkeeping machines than that allowed by the Commissioner. The evidence is generally to the effect that these machines do exhaust over a period of less than 10 years. On the other hand, these assets are only a part of the taxpayer's furniture and fixtures upon which the Commissioner has allowed depreciation at the rate of 10 per cent. A considerable amount of this equipment had a life substantially in excess of 10 years. Upon the entire record we are not disposed to disturb the determination of the Commissioner in respect of the exhaustion, wear, and tear of the taxpayer's property.

We are of the opinion that the contribution of the taxpayer to the Oneida County Farm Bureau was an ordinary and necessary expense of its business and should be allowed as a deduction.

The loss from the note of Sigmund Morris, claimed by the taxpayer to have been sustained in the year 1920, was, we believe, clearly determined in the year 1923, and the determination of the Commissioner in respect of this item is approved.

The matter of the account of Otto L. Sonne is really divisible into two parts. The Sonne account proper was closed out as a result of the bankruptcy proceedings instituted by the taxpayer itself, and upon that account it sustained a net loss of $2,903.84, when Sonne's bankruptcy proceedings were wound up in the year 1920. As an outgrowth of the Sonne bankruptcy, the taxpayer, through an agent, purchased the merchandise of Sonne and disposed of it on its own behalf. This, however, was an independent venture which had no necessary relation to the Sonne account. It appears that the agent, Rothstein, made deposits during the process of his liquidation of the Sonne merchandise, and that his deposit account became dormant in the bank in the year 1920, and stood from that time forward at $2,540.64 upon the bank's books.

In 1922 Rothstein's compensation was determined and the bank transferred the credit to his account, remaining after his com-

pensation was deducted, to its own profit and loss account for the year 1922. Rothstein, however, was at all times merely an agent of the bank and the account standing in his name upon the books of the bank was in reality at all times the property of the bank held for it by an agent acting from the beginning under its direction. Such being the case, we are of the opinion that the $2,540.64 gain on account of the sale of the Sonne merchandise should be accounted for in the year 1920. Rothstein was entitled to reasonable compensation for his work in connection with this matter, which became a liability of the bank from the time the work was completed. This liability, however, was contingent in amount and uncertain as to the time of liquidation. The amount was determined and paid in the year 1922, and we are of the opinion that it should be allowed as a deduction to the bank in that year.

This brings us to three series of transactions involving the relationship of the bank to one A. James Eckert. The transactions are distinct and involve different years, but in principle the action of the Commissioner is identical in all and the position of the taxpayer is likewise identical. The difficulty lies in the strain which the undisputed testimony of the taxpayer's witnesses places upon human credulity. In all of these cases Eckert is alleged to have made voluntary settlements with the bank in respect of sales of securities which he had theretofore purchased from it without any understanding or agreement as to any subsequent accounting. The Commissioner takes the position that these alleged sales are not sales at all and that Eckert was acting as the representative of the bank in the subsequent sale and ultimate realization upon the securities.

This position is borne out by the fact that in some instances Eckert's accounting to the bank was for the entire amount of the profits realized upon the sale of the securities less the ordinary rate of broker's commissions, but in all cases it would appear that substantially all of the profit realized by Eckert was ultimately returned to the bank. The taxpayer admits that these realizations represent taxable profit and makes no claim that Eckert made it the recipient of a voluntary gift. The sole issue between the Commissioner and the taxpayer is the year in which the loss is to be deducted, and whether the taxpayer may deduct a loss on account of the securities sold to Eckert at the time sold, thereafter accounting for the gain as all profit in the year in which he made the several returns of cash to it. Upon the hearing of this appeal the Commissioner was given an opportunity to examine A. James Eckert in Utica, N. Y., by deposition, if the Solicitor so desired. Had such examination taken place, we would have been disposed to allow the widest scope of cross-examination of Eckert as an adverse wit-

ness. The Commissioner has made no effort along these lines, and we are not disposed to disregard the testimony of apparently straightforward witnesses merely upon the ground that their testimony indicates conduct on the part of Eckert materially at variance with ordinary human experience. It is quite probable that the taxpayer seized upon the year 1919 to clear out of its vault securities which it regarded as having no value and to register its loss thereon. This it had a perfect right to do, if it actually did make the sales in question, and if there was in fact no understanding, expressed or implied, between the taxpayer and Eckert that he thereafter would account for the proceeds of sales of any such securities.

Needless to say, transactions of this character are to be considered in the light of all of the circumstances, both at the time and subsequently, which bear upon the question whether or not an actual sale was made. *Appeal of P. B. Fouke*, 2 B. T. A. 219. Upon the entire record the facts of an actual and *bona fide* transaction must be determined. *Appeal of the Pennsylvania Co. for Insurance, etc.*, 2 B. T. A. 48; *Appeal of Benjamin T. Britt*, 2 B. T. A. 53. Upon the record before us we are inclined to the opinion that the taxpayer actually disposed of the securities in question at the time and in the manner it claims to have done so, and it is entitled to deduct the losses so registered in the years concerned and should account for the profits as it has done in the years in which Eckert made payments on account thereof. This involves losses in the year 1919 of $14,172, on account of Eastern Power & Light, Wichita Falls, and Northwestern Railway bonds, and California Railway & Power stock; a loss of $23,750, on account of the sale of Chicago Elevated Railway notes; and a loss in the year 1921 of $5,000, sustained by the taxpayer on the sale of Winchester Co. stock.